RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0028p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

SHELBY ADVOCATES FOR VALID ELECTIONS; MICHAEL KERNELL; JOE TOWNS, JR.; ANN SCOTT; BRITNEY THORNTON,

>                   *Plaintiffs-Appellants*,

>        *v.*

>

TRE HARGETT, in his official capacity as Tennessee Secretary of State; MARK GOINS, in his official capacity as the Coordinator of Elections for the State of Tennessee; STATE OF TENNESSEE ELECTION COMMISSION; KENT YOUNCE, JUDY BLACKBURN, GREGORY DUCKETT, DONNA BARRETT, JAMES H. WALLACE, JR., TOM WHEELER, and MIKE MCDONALD, in their official capacities as members of the Tennessee Election Commission; LINDA PHILLIPS, in her official capacity as Administrator of the Shelby County Election Commission; SHELBY COUNTY ELECTION COMMISSION; ROBERT MEYERS, NORMA LESTER, DEE NOLLNER, STEVE STAMSON, and ANTHONY TATE, in their official capacities as Board Commissioners of the Shelby County Election Commission,

>                   *Defendants-Appellees*.

No. 19-6142

─────────────────

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:18-cv-02706—Thomas L. Parker, District Judge.

Argued: December 3, 2019

Decided and Filed: January 24, 2020

Before: GIBBONS, SUTTON, and MURPHY, Circuit Judges.

---

**COUNSEL**

---

**ARGUED:** Carolyn J. Chumney, CAROL CHUMNEY LAW PLLC, Memphis, Tennessee, for Appellants. Janet M. Kleinfelter, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for State of Tennessee Appellees. Pablo A. Varela, HARRIS SHELTON HANOVER WALSH, PLLC, Memphis, Tennessee, for Shelby County Appellees. **ON BRIEF:** Carolyn J. Chumney, CAROL CHUMNEY LAW PLLC, Memphis, Tennessee, for Appellants. Janet M. Kleinfelter, Matt F. Jones, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for State of Tennessee Appellees. Pablo A. Varela, John L. Ryder, HARRIS SHELTON HANOVER WALSH, PLLC, Memphis, Tennessee, for Shelby County Appellees. Megan C. Keenan, COVINGTON & BURLING LLP, Washington, D.C., Andrew Grosso, ANDREW GROSSO & ASSOCIATES, Washington, D.C., for Amici Curiae.

---

**OPINION**

---

PER CURIAM. Shelby Advocates for Valid Elections (SAVE) and four individual plaintiffs sued an assortment of state and local election officials and entities: Tennessee's secretary of state, coordinator of elections, and election commission and its members, along with the Shelby County Election Commission and its members. The claimants allege that, in future elections, the defendants will burden their right to vote, dilute their votes, and disenfranchise them in violation of the Fourteenth Amendment's Equal Protection and Due Process clauses. The district court granted the government's motion to dismiss the case for lack of standing. We affirm.

Based in Shelby County, Tennessee, SAVE focuses on "research, advocacy, and education to ensure the fundamental right to vote in public elections." R. 104 at 8. It pursues these goals by submitting open records requests about elections, reporting on election security, monitoring national developments in election law, organizing public events, and advocating for election reform.

Plaintiffs Michael Kernell, Ann Scott, Britney Thornton, and Joe Towns, Jr. allege that they plan to vote in future Shelby County elections. And they fear, the complaint says, that those votes will be denied or substantially burdened. Towns alleges that he plans to run for office in

the future, and Thornton alleges that she intended to be a city council candidate in 2019. Due to election administration problems in Shelby County, they claim that they will have to spend extra money campaigning and monitoring the election.

The plaintiffs also allege a variety of election administration problems. They say election workers are poorly trained, sometimes distributing the wrong ballots (say by giving a voter who lives in District 1 the ballot for District 2), sometimes recording the wrong address when registering a voter, and once distributing a poll book without redacting voters' personal information. Election workers, the plaintiffs allege, also have failed to recertify the voting machines as Tennessee requires. The plaintiffs also claim election personnel have not followed fair protocols for uploading votes from each polling place and that they have adjusted vote totals after uploads.

Plaintiffs also complain about Shelby County's use of digital voting machines. Because the machines connect to the Internet, the plaintiffs allege, that makes them vulnerable to hacking and cyberattacks. The machines may also be hacked, plaintiffs allege, by insertion of a memory card containing malware. And the machines do not produce a paper record of each voter's choices, which allegedly makes them difficult to audit for voter-protection purposes, whether to confirm that the machines recorded the votes accurately at the outset or to confirm that hackers did not modify the votes afterwards. The plaintiffs allege that the machines sometimes "flip" votes, recording a vote cast for A as a vote cast for B due to programming or maintenance problems.

Each of these problems, the plaintiffs say, is partly the responsibility of the State as well. They claim that it has failed to enact standards that sufficiently protect elections from hacking and voting-machine malfunctions because it does not require all counties to use paper ballots with optical scanning, and it does not prohibit Internet-capable voting machines or prescribe rules for handling voting-machine memory cards.

To remedy these problems, the plaintiffs request a variety of forms of relief. They ask for an injunction requiring Shelby County to buy secure election equipment and allocate adequate funding to protect its elections. They ask for a permanent injunction preventing the commission

from using the current machines in future elections. And they ask for a mandamus order compelling decertification of the existing voting machines, implementation of uniform testing for voting machines, and reexamination of the voting system, along with appointment of a supervisor to review current voting procedures and oversee the requested changes.

To remedy the election administration problems, the plaintiffs seek an injunction requiring, among other things, system password protection, public observation of vote processing, pre-election voting machine testing, post-election audit procedures, voter data protection, background checks for poll workers and equipment vendors, preservation of all digital ballot images, and immediate disclosure of election irregularities before the close of polls on each election day. They also seek a judgment declaring that Shelby County's system violates numerous provisions of the federal constitution.

The district court granted the defendants' motion to dismiss the lawsuit because the plaintiffs lack standing—in particular a concrete injury—to bring the lawsuit. This appeal followed.

A plaintiff has Article III standing if he suffered an injury in fact that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged conduct; and likely to be redressed by a favorable judgment. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016). To obtain declaratory or injunctive relief, a claimant must show a present ongoing harm or imminent future harm. *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001). At the pleading stage, plaintiffs bear the burden of alleging facts establishing each element of standing. *Spokeo*, 136 S. Ct. at 1547.

The plaintiffs stake their standing to bring this lawsuit on three theories of injury. The individual plaintiffs point to their alleged future risk of vote dilution or vote denial stemming from maladministration and technology problems. SAVE says it has associational standing to litigate on behalf of its members. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000). And SAVE says it separately has organizational standing to litigate in its own right because the election problems caused it to divert resources from its other activities. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982).

All three theories share, at a minimum, an imminence problem. The complaint's allegations with respect to injury all boil down to prior system vulnerabilities, previous equipment malfunctions, and past election mistakes. Past may be precedent. But the Supreme Court has not been sympathetic to claims that past occurrences of unlawful conduct create standing to obtain an injunction against the risk of future unlawful conduct. *See O'Shea v. Littleton*, 414 U.S. 488, 495–98 (1974) (allegation, based on past examples, of discriminatory prosecution); *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983) (allegation, based on plaintiff's past experience, that policy of using constitutionally excessive chokeholds increased risk of experiencing another).

The crux of the problem is that nearly all of the plaintiffs' allegations of past harm stem from human error rather than errors caused by the voting machines or hacking. Fear that individual mistakes will recur, generally speaking, does not create a cognizable imminent risk of harm. Think about how the Court addressed this point in *Lyons*, a case in which the plaintiffs sought to enjoin members of a police department, who had violated the constitutional rights of arrestees in the past, from engaging in similar misconduct in the future. The Court concluded that the plaintiff could establish standing only if he pleaded "(1) that *all* police officers in Los Angeles *always*" take the challenged action, using unnecessary chokeholds, when interacting with "any citizen with whom they happen to have an encounter," or (2) "that the City ordered or authorized police officers to act in such manner." *Lyons*, 461 U.S. at 105–06. Today's plaintiffs face a similar plight. They do not allege—they cannot plausibly allege—that Shelby County election officials *always* make these mistakes, and they do not allege that the government entities ordered the election workers to make any such mistakes.

The plaintiffs have tied only one of their allegations of past harm, the "flipped" votes they allege happened in 2016 and in 2018, to machine malfunctions rather than human error. But they do not allege that this vote-flipping ever happened to any of them or in any election in which they were candidates, and the evidence they produced indicates that "all errors" were "corrected prior to casting [the] ballot[s]." R. 104-23; R. 104-24. Even if this were not the case, even in other words if the plaintiffs had adequately alleged past harm, they have not plausibly alleged, much less shown, that future vote-flipping is "certainly impending." *Clapper v.*

*Amnesty Int'l*, 568 U.S. 398, 402 (2013). Nor, to the extent the Supreme Court has suggested the possibility that a "substantial risk" plus mitigation costs can satisfy the imminence requirement, would that make a difference. The plaintiffs have not plausibly shown that there is a substantial risk of vote flipping. *See id.* at 414 n.5; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). In the absence of imminent harm, the individual plaintiffs have no standing to sue and thus no basis for moving forward with their claims.

That same problem dooms SAVE's claim of associational standing. One precondition of this type of standing is that the association's "members would otherwise have standing to sue in their own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). In the absence of cognizable Article III injuries affecting its members, SAVE has no basis for asserting such claims for them.

SAVE's organizational standing claim faces two distinct problems. One is that it pleads only backward-looking costs, not the imminent future injury needed to establish standing for declaratory and injunctive relief claims like this one. *Grendell*, 252 F.3d at 832. The other is that an organization can no more spend its way into standing based on speculative fears of future harm than an individual can. *Clapper*, 568 U.S. at 416. Plus, SAVE did not divert resources from its mission to prepare for litigation in this case. The alleged diversionary actions— spending money to "bring, fund, and participate in this litigation," R.104 at 70, and spending its resources "to address the voting inequities and irregularities" throughout the county, *id.* at 9—do not divert resources from its mission. That is its mission.

In reaching this conclusion, we need not resolve how the pleading standards implicated by motions to dismiss under Civil Rule 12(b)(6) relate to the pleading standards implicated by motions to dismiss for lack of standing in Civil Rule 12(b)(1) motions like this one. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). True, standing-related cases before *Twombly* and *Iqbal* "presum[ed] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)). But *Twombly* and *Iqbal* replaced *Conley*'s permissive pleading standard, calling into question the use of the *Conley* rule in the Rule 12(b)(1) context.

Our sister circuits have split on the issue. *Compare Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1227 & n.1 (10th Cir. 2010), *with James v. J2 Cloud Servs. LLC.*, 887 F.3d 1368, 1372 (Fed. Cir. 2018). Because today's plaintiffs would fail under either standard, we see no need to resolve the question today.

*Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565 (6th Cir. 2004) (per curiam), does not lead to a different conclusion. It concluded that plaintiffs' feared injury was sufficiently imminent because some voters would likely be denied the chance to vote based on the challenged voting policy. *Id.* at 574. While the plaintiff organizations could not "identif[y] specific voters" who would mistakenly be denied the chance to vote and thus could not allege with certainty that their members would be harmed, we concluded that they nevertheless possessed standing because "[i]t is inevitable . . . that there will be such mistakes." *Id.* That reasoning does not apply here. In *Sandusky*, the challenged policy—which violated a federal statute—made it "inevitable" that the defendants would deny individuals their voting rights. Here, by contrast, plaintiffs allege only policies that add risk to the ever present possibility that an election worker will make a mistake. No injury may occur at all. Any analogy to *Sandusky* falls short.

Also falling short are the claims of the individual plaintiffs who plan to run for office in the future. Thornton and Towns say the challenged actions mean they will have to spend more money campaigning outside their districts and hiring poll watchers and a cybersecurity expert. R. 104 at 73–75. But plaintiffs may not bootstrap their way into standing by "inflicting harm on themselves based on their fears of a hypothetical future harm." *Clapper*, 568 U.S. at 416. Any such approach would eviscerate the Article III standing imperative, as it would permit the plaintiff who is willing to pay for unreasonable mitigation measures to prevent an unlikely future harm to manufacture standing.

The plaintiffs claim that the reasoning of our decision in *Stewart v. Blackwell* establishes standing in this case. 444 F.3d 843 (6th Cir. 2006). True or not, the case makes no difference here. The dispositive point is that the en banc court vacated the decision. *Stewart v. Blackwell*, No. 05-3044, 2006 U.S. App. LEXIS 32545 (6th Cir. July 21, 2006) (en banc).

The plaintiffs rely on a Georgia district court case that required a county to replace its identical voting machines after they were hacked twice. *Curling v. Raffensperger*, 403 F. Supp. 3d 1311 (N.D. Ga. 2019). But even if we agreed with the court that examples of hackers disrupting those particular voting machines showed an imminent harm somewhere in Georgia— or for that matter anywhere in the United States—that does not translate into an imminent risk that individuals will hack the voting machines in Shelby County, Tennessee. The long and short of it is that the plaintiffs failed to demonstrate the imminence of any injury in fact, depriving them of Article III standing to bring this claim.

We affirm.