RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0208p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

RONALD WEISER; MICHIGAN REPUBLICAN PARTY,

*Plaintiffs-Appellants*,

*v.*

No. 22-1014

JOCELYN BENSON, in her official capacity as Secretary
of State,

*Defendant-Appellee*,

WHITMER FOR GOVERNOR COMMITTEE,

*Intervenor-Appellee*.

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:21-cv-00816—Janet T. Neff, District Judge.

Argued: June 9, 2022

Decided and Filed: September 9, 2022

Before: WHITE, BUSH, and READLER, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Edward M. Wenger, HOLTZMAN VOGEL BARAN TORCHINSKY &
JOSEFLAK PLLC, Washington, D.C., for Appellants. Erik A. Grill, UNITED STATES
ATTORNEY'S OFFICE, Lansing, Michigan, for Appellee Benson. Christopher M. Trebilcock,
CLARK HILL PLC, Detroit, Michigan, for Appellee Whitmer. **ON BRIEF:** Edward M.
Wenger, Jason B. Torchinsky, HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFLAK
PLLC, Washington, D.C., for Appellants. Erik A. Grill, Heather S. Meingast, UNITED
STATES ATTORNEY'S OFFICE, Lansing, Michigan, for Appellee Benson. Christopher M.
Trebilcock, Carly O. Machasic, CLARK HILL PLC, Detroit, Michigan, for Appellee Whitmer.

WHITE, J., delivered the opinion of the court in which BUSH, J., joined. READLER, J.
(pp. 15–20), delivered a separate opinion concurring in part and in the judgment.

———————————

**OPINION**

———————————

HELENE N. WHITE, Circuit Judge.    Plaintiffs-Appellants—Ronald Weiser, a Republican donor and chair of the Michigan Republican Party (MRP), and the MRP—filed this action against Defendant-Appellee, Michigan Secretary of State Jocelyn Benson, alleging that an interpretative statement and a declaratory ruling issued by the Michigan Secretary of State in the 1980s (the recall exception) violates the First and Fourteenth Amendments because it allows supporters of Governor Gretchen Whitmer to make or receive contributions on more favorable terms than Weiser or the MRP with respect to the 2022 gubernatorial election.  The district court dismissed the action for lack of standing after concluding that neither Weiser nor the MRP had suffered an injury in fact.  Because Weiser and the MRP fail to plausibly demonstrate that the recall exception prevents Weiser or the MRP from equally supporting their preferred gubernatorial candidate, we AFFIRM.

## I.

## A.

The Michigan Campaign Finance Act (MCFA) limits the amount of money individuals and groups may donate to candidates vying for publicly elected offices during each election cycle.  *See* Mich. Comp. Laws § 169 *et seq.*  The general-election cycle begins "the day following the last general election in which the office appeared on the ballot" and ends "on the day of the general election in which the office next appears on the ballot."  *Id.* § 169.205(3)(a).  During this period, individuals may contribute up to $7,150 to any candidate committee of a candidate running for statewide elective office, including the office of governor; and state central committees of a political party, like the MRP and the Michigan Democratic Party (MDP), may contribute up to twenty times this amount.  *Id.* § 169.252(1)(a), (4).[1]  The MCFA places no limitations on when someone may become a general-election candidate; it requires only that a

—————————————
[1]Section 169.252(1)(a) lists $6,800 as the applicable amount for individual contributions; however, pursuant to her statutory duty, Benson increased this amount to $7,150.  *See* Mich. Comp. Laws § 169.246 (allowing the Secretary of State to adjust contribution limits based on increases or decreases in the consumer price index).

candidate committee be formed to manage contributions and expenditures within ten days after one becomes a candidate. *See id.* §§ 169.203(1), 169.221.

A "recall vote" is also an "election," *id.* § 169.205(2), but different rules apply. In 1983, the Michigan Secretary of State issued an interpretative statement to clarify that the general-election contribution limits established in section 169.252 of the MCFA do not apply to contributions made to an officeholder to defend against a recall effort. R. 1-1 PID 19. The interpretative statement offers two rationales. First, although "contributions to a candidate committee of a candidate for state elective office" are capped by the MCFA at various amounts, because "a recall vote does not fill a public office . . . the candidate committee of an officeholder subject to a recall vote is not a 'candidate committee of a candidate for state elective office.'" R. 1-1- PID 20. More simply, a recall election is not a general election. Second, because proponents of a recall measure must organize a political committee and contributions to political committees are not subject to any cap, capping contributions made to an officeholder facing recall would allow "the political committee advocating the recall to engage in unlimited fundraising, while severely limiting the officeholder's ability to raise money." R. 1-1 PID 21. Therefore, if there is a recall effort actively underway, the officeholder's committee may "accept contributions in excess of section [169.252's] contribution limitations." R. 1-1 PID 21.

The interpretative statement further provides that contributions to an officeholder to oppose an active recall effort must be so designated and must be deposited into the committee's account. R 1-1 PID 19–20. If a recall election never materializes, the officeholder's committee must divest itself of these contributions. R 1-1 PID 21. A recall donor may choose to allow the officeholder to retain a portion of the contribution for her next election—but only up to the MCFA's $7,150 cap—by expressly stating this in writing; any portion of the recall contribution exceeding the cap must be returned to the donor. R. 1-1 PID 21. "Any contribution, or portion of a contribution, not otherwise designated by a contributor in the instance where a recall election is not called, shall be given by the candidate committee to a political party committee or to a tax exempt charitable organization."[2] R. 1-1 PID 21.

---

[2]Upon dissolution, a political committee may dispose of its funds in any legal manner, which the parties suggest means that unexpended funds of a political committee advocating a recall may be disbursed to any political

In 1984, the Michigan Secretary of State issued a declaratory ruling affirming the 1983 interpretative statement, including the statement's conclusion that contribution limits during a recall cycle must apply equally to "contributors to the proponents of a recall" and "contributors to the committee of the state official who is the subject of the recall," meaning that both sides must be able to raise unlimited funds. R. 1-2 PID 25. The reasoning, again, was that because a political committee promoting a recall effort is not subject to contribution caps, an officeholder facing an active recall effort also should not be. R. 1-2 PID 24–25.

**B.**

In 2020 and 2021, apparently in response to Governor Whitmer's various measures to combat the spread of COVID-19 in the state, twenty-seven recall efforts were launched by Michigan voters. R. 41-2 PID 289–297. The recall cycle—the time during which an officeholder may accept recall funds—began on May 12, 2020, when the first recall petition was filed, and ended on July 26, 2021, when the last recall petition became invalid for submission and no other recall effort remained pending. *See* Letter from Adam Fracassi, Mich. Bureau of Elections, to Tori Sachs, Michigan Freedom Fund, 6–11 (Dec. 21, 2021), https://www.michigan.gov/sos/-/media/Project/Websites/sos/25delrio/MFF_v_Whitmer_File _744164_7.pdf?rev=9446770e06764b3bac1b3d93a0b82833&hash=73C55FB1A93AFA14478D 0CE1992A877D (explaining how recall cycles begin and end) [hereinafter *Fracassi Letter*].[3] During this time, the Whitmer for Governor Committee (Whitmer's committee) raised over $3.7 million in recall funds from 157 donors. Appellants Br. at 8.

In December 2021, the Michigan Bureau of Elections (Bureau) ordered Whitmer's committee to disgorge all recall-designated funds, as directed by Mich. Comp. Laws § 169.245,

---

party or tax-exempt organization as well. *See Dissolution of a Committee*, Mich. Bureau of Elections, https://mertsplus.com/mertsuserguide/index.php?n=MANUALS.AppendixW (last visited Aug. 25, 2022); *see also* Letter from Terri Lynn Land, Mich. Secretary of State, to Gary R. Campbell, Lippert, Humphreys, Campbell, Dust & Humphreys, P.C., 2 (Aug. 21, 2006), https://www.michigan.gov/-/media/Project/Websites/sos/01anchak /Gary_Campbell__DR_IS_8212006.pdf?rev=1aac90650c694367a090a339b541b31e (noting the absence of authority regarding the disposition of unexpended funds by a political committee).

[3]Benson asks the court to take judicial notice of the *Fracassi Letter*. Because the letter is publicly available and there is no reason to doubt that it accurately represents the findings and conclusions of the Michigan Bureau of Elections, we grant Benson's motion.

except those being used to defend the committee in litigation related to the many recall petitions. *Fracassi Letter* at 9–10. Section 169.245, which normally applies upon termination of a candidate committee, provides that "unexpended funds in the candidate committee that are not eligible for transfer to another candidate committee of the person . . . shall be disbursed as follows":

(a) Given to a political party committee.

(b) Given to a tax exempt charitable organization, as long as the candidate does not become an officer or director of or receive compensation, either directly or indirectly, from that organization.

(c) Returned to the contributors of the funds upon termination of the campaign committee.

(d) If the person was a candidate for the office of state representative, given to a house political party caucus committee.

(e) If the person was a candidate for the office of state senator, given to a senate political party caucus committee.

(f) Given to an independent committee.

(g) Given to a ballot question committee.

Mich. Comp. Laws § 169.245(2). When ordering Whitmer's committee to disgorge leftover recall funds, the Bureau stated that the committee had not expended any portion of them on "campaign advertising." *Fracassi Letter* at 11. On December 29, 2021, Whitmer's committee disgorged the leftover recall funds, refunding $250,000 to an individual donor and disbursing over $3.5 million to the MDP. Appellants Br. at 9; Defendant-Appellee Br. at 8; Intervenor-Appellee Br. at 7.

## C.

On September 20, 2021, Weiser and the MRP filed suit against Benson, in her official capacity, alleging that Whitmer's committee had "decided to suborn, accept, and retain contributions from her supporters in excess of the [MCFA's] legal limits" by using the recall exception to "circumvent[] the contribution limits that apply to all other candidates in the [2022] gubernatorial race." R. 1 PID 1–2. Weiser and the MRP claimed they are prevented from "supporting their candidates to the same level and extent as that enjoyed by their Democrat counterparts" in violation of the First and Fourteenth Amendments, and asked for declaratory

and permanent injunctive relief to enjoin Benson from "applying or implementing" the recall exception in the "upcoming gubernatorial election," and temporary injunctive relief to "ensure an equitable application of the MCFA to all parties involved in the gubernatorial race." R. 1 PID 8, 15–16. Whitmer's committee filed an unopposed motion to intervene in mid-October. R. 8; R. 11.

On November 15, Whitmer's committee informed the Michigan Board of Canvassers that it intended to disburse all recall funds, which Weiser and the MRP understood to mean a disbursement of funds to the MDP "or to dark money groups aligned with Whitmer's campaign." R. 37-1 PID 208; R. 34-1 PID 152. Weiser and the MRP moved for a temporary restraining order (TRO) three days later, R. 34, arguing that disbursing funds to the MDP would allow it to help Whitmer's "reelection campaign (or those of her political allies), which results in the same inequity that the Plaintiffs are trying to remedy by pursuing this lawsuit—*i.e.*, Governor Whitmer's one-sided end-run around Michigan campaign-contribution limits" with respect to the 2022 general election. R. 34-1 PID 154. Weiser and the MRP argued that "the only constitutionally acceptable remedy" is to order "the return of such funds to the donors who contributed them." R. 34-1 PID 155.

At the TRO hearing, Weiser and the MRP stated that their constitutional claim "boils down to this":

> One particular kind of competitor in the 2022 election, a candidate, can raise unlimited money and then transfer that money to her allies at the conclusion of the recall proceedings, and another class of candidates, namely, you know, Republican candidates for governor, are subjected to the $7,150 limit. They cannot raise unlimited funds, and they cannot transfer those unlimited funds to their allies.

R. 45 PID 399. Whitmer's committee responded that Weiser had given over $1 million to the MRP over the last year, "[s]o to somehow allege that he's been harmed by contributions in excess of $7,150 that might end up in the Democratic coffers . . . does not ring true." R. 45 PID 409–10. Weiser and the MRP replied that allowing candidates to raise unlimited amounts and "inject [them] into the state's political economy is problematic" because "no Republican candidate for governor can compete with" such amounts. R. 45 PID 413–14. The district court

denied the TRO motion after concluding that Weiser and the MRP failed to show irreparable harm or "even a minimal infringement on" their constitutional rights. R. 45 PID 416–20. It also determined that the "question of standing . . . is a major one" and ordered the parties to brief the issue. R. 45 PID 405, 421.

In its supplemental brief, Whitmer's committee argued that Weiser and the MRP alleged no plausible injury in fact: they "have the same ability to financially support the recall committees against incumbents like Governor Whitmer . . . [and] the same ability to support political parties and non-profit entities that are likely to support candidates that oppose Governor Whitmer's re-election efforts during the 2022 gubernatorial election." R. 46 PID 433. In short, "Plaintiffs can engage in the exact same activity they seek to prevent." R. 46 PID 437. Benson argued much the same, adding that because the recall exception specifically prohibits Whitmer's committee from using recall funds in excess of MCFA limits to support her reelection, it actually prevents the occurrence of Weiser's or the MRP's claimed injury. R. 47 PID 453–56.

Weiser and the MRP further argued that because Weiser's speech was "capped at $7,150 while scores of individuals who support the Governor have given her up to thirty-five times that amount" and "none of the political parties who oppose Governor Whitmer's reelection efforts (especially the Michigan Republican Party) enjoy the same uninhibited money-movement flexibility that the Michigan Democratic Party is about to exploit," both plaintiffs have standing. R. 48 PID 460. Weiser and the MRP also argued that because Whitmer "has already spent some of these so-called recall funds . . . means that a concrete injury has in fact occurred and cannot be mooted by her proposed actions," and that "giving these funds to the political party that can (and will) either send this money right back to her campaign or use the money to promote her reelection efforts" does not solve the "unequal political-fundraising field" created by the recall exception. R. 48 PID 461.

The district court determined that because Weiser and the MRP's complaint "is based not on a restriction—individual contribution limits under [section 169.252]—but rather on elevated or unlimited contribution limits applied across the board to detractors and supporters in recall campaigns," they failed to show a direct injury resulting from asymmetrical contribution limits. R. 50 PID 493–94. The district court also stated that complaining about Michigan's lack of

harmonization between contribution limits in the recall- and general-election contexts is not a grievance particular to Weiser or the MRP; it is no different than claiming a harm to every citizen's interest.  R. 50 PID 494.  Finally, the district court determined that Weiser and the MRP's alleged harm was self-inflicted because "Plaintiffs concede that they could have contributed unlimited amounts to a recall committee opposing the Governor but did not do so."  R. 50 PID  495.  After concluding that Weiser and the MRP lacked standing, the district court dismissed the action.  R. 50 PID 496.  Weiser and the MRP timely appealed.  R. 51.

## II.

This court reviews de novo whether a plaintiff has standing.  *Price v. Medicaid Dir.*, 838 F.3d 739, 745 (6th Cir. 2016).  "To qualify for standing, a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling."  *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  Here, the dispute turns on the first element—an injury in fact—which either Weiser or the MRP must plausibly demonstrate for the action to survive dismissal.  *Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.,* 13 F.4th 531, 543–44 (6th Cir. 2021); *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 710 (6th Cir. 2015).

An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical."  *Parsons*, 801 F.3d at 710 (quoting *Lujan*, 504 U.S. at 560).  To be concrete, the injury must be "real, and not abstract"; and, to be particularized, it "must affect the plaintiff in a personal and individual way."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339–40 (2016) (internal quotation marks omitted); *see also id.* at 339 n.7 (noting that simply because others may suffer the same injury does not mean that the injury is necessarily a generalized grievance).  "Actual" is just that—a direct injury that has been sustained.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).  "Imminence," although "a somewhat elastic concept," cannot be "too speculative": it must be "*certainly* impending," not merely a "*possible* future injury."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 411 (2013).

In short, either Weiser or the MRP[4] must plausibly demonstrate that a real and direct harm has been sustained in an individual way (or is certainly impending).[5]

**III.**

A contribution scheme that allows a candidate to receive contributions on more favorable terms than his or her opponent may give rise to a cognizable injury in fact. *Davis*, 554 U.S. at 729, 734–35 (concluding that a self-funded candidate had standing to challenge a statute that allowed his non-self-financing opponent to receive contributions at treble the normal limit until both had expended $350,000).[6] By extension, a contribution scheme that allows one candidate's supporters to contribute or collect funds on more favorable terms than another's may give rise to an injury in fact as well. Weiser and the MRP contend that this is the case here, framing their injury as that the recall exception allowed Whitmer donors to give uncapped amounts to Whitmer's committee during the recall cycle, most of which ended up with the MDP after the cycle had ended, yet Weiser and the MRP cannot contribute or raise funds in the same way for the 2022 Republican gubernatorial candidate. Appellants Br. at 20–25. However, this framing conflates the recall- and general-election contexts. Because the two contexts involve distinct

---

[4]We note that the MRP asserts that it has both standing "in its own right" and associational standing. Appellants Br. at 23. However, an organization must "identify a member who has suffered (or is about to suffer) a concrete and particularized injury from the defendant's conduct" to establish associational standing. *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 543–44. Here, the only identified member of the MRP is Weiser, so the question of MRP's associational standing turns solely on whether Weiser plausibly demonstrates an injury in fact.

[5]Although standing is determined on a claim-by-claim basis, all the parties argue the First and Fourteenth Amendment claims as one. *See, e.g.*, Appellants Br. at 20 ("Because [Weiser and the MRP] have legally cognizable interests (protected by the First and Fourteenth Amendments) in uniform campaign contribution limits, the next question is whether the Recall Exception harms those interests in a concrete and particularized way."). We will consider them as one as well. *Cf. Davis*, 554 U.S. at 733–35 (considering nearly identical claims as one).

[6]We recognize that, as in *Davis*, whether Weiser or the MRP plausibly demonstrates that the recall exception inflicts an injury in fact shades into whether they plausibly allege a constitutional basis for their claims. In *Davis*, the Supreme Court first considered the issue of standing, concluding that the plaintiff adequately demonstrated injury in fact by showing that a contribution scheme "allow[ed] his opponent to receive contributions on more favorable terms." 554 U.S. at 734–35. Then, when considering the merits, the Court stated that if a contribution scheme allowed the plaintiff's opponent to raise more money because of asymmetrically favorable terms, it would impermissibly diminish the plaintiff's free speech; but, if contribution limits applied across the board, there would be no basis to challenge them. *Id.* at 736–38. Based on the Court's reasoning, if a contribution scheme allows opponents to raise or contribute campaign funds on equitable terms, no injury in fact would be sustained. In this case, unlike in *Davis*, a plaintiff challenging the scheme would lack standing and the inquiry would end.

types of opponents and contribution rules, we must analyze them separately to determine whether Weiser and the MRP plausibly demonstrate an injury in fact in either context.

**A.**

When the governor is subject to recall, candidates do not vie for the office.[7]  Instead, a recall pits the governor, as an officeholder, against proponents of his or her recall.  If the recall effort results in a recall election, the ballot simply asks whether the governor should be recalled.  Mich. Comp. Laws § 168.975e.  And, if the governor is recalled, he or she is replaced as designated in the Michigan Constitution, beginning with the Lieutenant Governor.  Mich. Comp. Laws § 168.975g; Mich. Const. art. V, § 26.

These are special rules applying only to a special election to recall the governor; a gubernatorial recall election is wholly distinct from a general election in which opposing candidates compete against each other to fill the office.  Framing contributions in the recall context as contributions to a gubernatorial candidate is thus not accurate.  The relevant question is whether the recall exception allowed rivals—those either opposing or supporting an effort to recall Whitmer—to support their preferred recall outcome on equal terms.

Pursuant to the recall exception, Whitmer's committee and any political committee supporting her recall were held to same contribution limit: none.  R 1-1 PID 21; R. 1-2 PID 24–25.  As a result, both proponents and opponents of Whitmer's recall could contribute unlimited funds while the recall cycle was open.  R. 1-2 PID 24–25.  Although Weiser and the MRP declined to participate in the various recall efforts, they acknowledge that they could have contributed unlimited funds to any political committee supporting Whitmer's recall, Reply at 12, just as donors opposing Whitmer's recall could have contributed unlimited, recall-designated funds to her committee or other committees opposing the recall, if any.  In short, there was no asymmetry with respect to Whitmer-recall fundraising and therefore no injury in this regard.

---

[7]However, when other state officeholders are subject to a recall election, an election with opposing candidates is held and the candidate with the highest number of votes is elected for the rest of the term.  Mich. Comp. Laws § 168.975.

Weiser and the MRP claim an additional harm: the recall exception allowed Whitmer's committee to "potentially spend [recall] funds" on her reelection efforts during the recall cycle. R. 1 PID 7. But plaintiffs failed to provide factual support for this claim below and do not develop it on appeal. R. 48 PID 474; Reply at 5. Moreover, the Bureau found no evidence that Whitmer's committee spent recall funds on campaign advertising, *Fracassi Letter* at 11, and the recall exception explicitly prohibits officeholders from using recall funds to promote general-election efforts, R. 1-1 PID 21. Thus, any harm related to this complaint is, at best, highly speculative.

In sum, Weiser and the MRP fail to plausibly demonstrate that they suffered any injury in fact in the recall context.

**B.**

In the general-election context—when candidates do, in fact, vie for office—the MCFA's contribution limits apply. Individuals may contribute up to $7,150 to a gubernatorial candidate's committee; and political parties, like the MDP or the MRP, may contribute up to twenty times this amount. Mich. Comp. Laws § 169.252.[8] Additionally, the MCFA permits individual donors to give unlimited funds to political parties, and allows political parties to spend unlimited funds generally in support of their preferred candidate. Appellants Br. at 25; Reply at 7, 14; Defendant-Appellee Br. at 33–34; Intervenor-Appellee Br. at 15–16.

In this context, Weiser and the MRP claim that because the recall exception allowed Whitmer's committee to disburse leftover recall funds to the MDP, which may now use those funds to support her reelection, Weiser and the MRP are unable "to support, on equal terms with their political rivals, a candidate of their own choosing" given that they cannot make or receive contributions in the same way. Appellants Br. at 27–28. We disagree.

With respect to individual contributions to 2022 gubernatorial candidates, Whitmer's committee was not allowed to retain any portion of a recall contribution unless a donor expressly

---

[8]As noted, although § 169.252 lists "$6,800" as the applicable individual cap, this amount has been adjusted up to $7,150. *See supra* note 1.

stated in writing that she could keep up to $7,150 for her next election.[9]  If a donor chose to contribute the full $7,150, this donor would be maxed out and unable to contribute any more to her reelection committee.  This is the same general-election limit that applies to any contribution Weiser may choose to make to his preferred gubernatorial candidate, so there is no asymmetry in this regard.

We are also unpersuaded that the recall exception, by allowing leftover recall funds from an officeholder's committee to be disbursed to a political party, leaves the MRP unable to support its preferred gubernatorial candidate on equal terms with the MDP.  The MRP alleges that because the MDP can contribute to Whitmer's committee "a sum twenty-times the amount an individual may donate—and then spend unlimited funds generally in support of her campaign efforts," the plaintiffs have sustained an injury in fact.  Appellants Br. at 24.  But, the MRP may support its preferred candidate on the very same terms.  Simply because leftover recall contributions were disbursed to the MDP by Whitmer's committee after the recall cycle had ended does not mean that Whitmer's committee and the MDP engaged in "a money-laundering operation" to circumvent the MCFA's contribution limits.  Appellants Br. at 24.  A political party may collect unlimited funds at any time; the MDP did not need the recall exception to do so.

---

[9]At oral argument, it was suggested that the recall exception allowed Whitmer's committee to retain $7,150 from *every* recall contribution, even if a recall donor merely intended to support her recall defense, not necessarily her reelection.  This, however, does not comport with the language of the recall exception, which states that "a contribution designated for the recall election may not be retained unless otherwise designated by" the recall donor.  R. 1-1 PID 21.  If a recall election fails to be called, a recall donor "may indicate in writing that the portion of the contribution not exceeding the applicable limitation [of the MCFA] may be retained by the candidate committee for the next election in which the candidate is involved," and the rest "must be returned" to the donor.  R. 1-1 PID 21.  Thus, the only way for Whitmer's committee to have retained a portion of any recall contribution is if the donor expressly indicated that the donor wanted to contribute to Whitmer's reelection effort in addition to her recall defense.

According to Weiser and the MRP's own accounting, of the roughly $3.7 million allegedly raised by Whitmer's committee to combat the recall efforts, $250,000 was returned to a donor and "the remaining $3,548,865.61" was disbursed to the MDP.  Appellants Br. at 8.  This suggests that one donor may have allowed Whitmer's committee to retain a portion of the recall contribution for her reelection—which, again, would have been capped at the same amount as Weiser's contribution—while the others did not, given that contributions not designated for return or the officeholder's next election "shall" be disbursed to a political party or a tax-exempt organization.  R. 1-1 PID 21.  We note that our decision does not rest on this understanding of the exception.  Even if Whitmer's committee could retain $7,150 from each of the 157 donors to her recall defense, Weiser and the MRP would still be on equal footing because those donors would be capped at the $7,150 contribution limit and would then be unable to contribute any further amounts to the committee.

Further, although the recall exception allowed money originally designated to stave off Whitmer's recall to be disbursed to the MDP at the end of the recall cycle, and the MDP could now use some or all of these funds to further Whitmer's general-election effort, we see no asymmetrical contribution scheme. By contributing unlimited amounts to combat Whitmer's recall and not requesting the return of leftover funds or designating a portion of them for her reelection once the recall cycle had ended, these donors effectively contributed these funds to the MDP for the general election, not to Whitmer, just as Weiser may contribute unlimited amounts to the MRP for the same purpose by a more direct route (in fact, Weiser donated over $1 million to the MRP in 2021 alone, R. 41-6 PID 377). To be sure, the specific means by which Weiser may contribute to the MRP is different, given that there was no Republican gubernatorial candidate facing recall in 2020 and 2021, but this does not mean that the recall exception prevents him from achieving the same end: giving uncapped amounts to a political party to further its gubernatorial candidate's election efforts.[10] Consequently, Weiser and the MRP have not suffered a plausible injury in fact. *See Phillips v. DeWine*, 841 F.3d 405, 416 (6th Cir. 2016) (stating that standing for a free-speech claim generally requires showing that the policy in question has prevented the plaintiff from engaging in protected speech); *Johnson v. U.S. Off. of Pers. Mgmt.*, 783 F.3d 655, 665 (7th Cir. 2015) ("The mere allegation of unequal treatment, absent some kind of actual injury, is insufficient to create standing . . . standing [is not] based solely on being treated differently."); *cf. Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (recognizing that standing may be established when it is more difficult for a group to obtain a benefit).

Weiser and the MRP argue that leftover recall contributions should have been returned to Whitmer's recall donors, not the MDP, but there is no indication that these donors, save one, designated any contribution for return in lieu of disbursement (and, of course, any donor grievance regarding a failure to return funds is not Weiser's or the MRP's to assert). Finally,

---

[10]Weiser and the MRP contend that contributing unlimited funds in support of a general-election candidate is different from contributing unlimited funds to a political party, Reply at 8, 14, but, again, this framing is unpersuasive because it conflates the recall- and general-election contexts. Whitmer's recall donors gave designated recall contributions to an officeholder facing recall, not a general-election candidate; then, the unexpended portions of these contributions not designated for return to the contributors or for her reelection (up to the MCFA cap) were disbursed to the MDP after the recall cycle had ended. Thus, at no point did Whitmer's recall donors directly contribute unlimited funds to a general-election candidate. Nor did Whitmer end up with unlimited funds.

Weiser and the MRP contend that the recall exception allowed Whitmer to generate "(faux) fundraising momentum" to "show undecided Michigan voters that others have faith in the job she is doing." Appellants Br. at 21, 23. However, even assuming that this type of harm has any relation to Weiser and the MRP's alleged injury in fact—being unable to contribute or raise funds in the same way as Whitmer supporters—the recall exception never prevented Weiser from giving unlimited amounts to generate fundraising momentum for the Republican gubernatorial effort, or the MRP from spending unlimited amounts to spread the preferred message that voters have lost faith in Whitmer as governor.[11]

In sum, Weiser and the MRP fail to plausibly demonstrate any injury in fact and therefore lack standing.[12]

* * *

For the foregoing reasons, we AFFIRM the district court's dismissal of the action.

---

[11]Judge Readler posits that the MRP might have standing had it pursued a competitive-injury theory. But it did not, and our duty is to resolve questions actually before us, not those based on speculation. In any event, we are unpersuaded that the recall exception advantages incumbents facing recall efforts in that they may drum up support for reelection before primary elections are held and an ultimate challenger is identified. Incumbents often have an advantage leading up to primaries because potential challengers must first battle it out among themselves, which is the nature of American politics. And, because their survival is singularly threatened, officeholders subject to recall are uniquely positioned to drum up support, which is the nature of recalls. Neither is attributable to the recall exception. Moreover, any 2022 Republican gubernatorial candidate has been able to raise $7,150 from each donor since the beginning of the general-election cycle, so long as he or she formed a candidate committee, and the MRP has been able to raise unlimited funds to support its gubernatorial candidate at any time—just like Whitmer's committee and the MDP.

[12]We thus have no need to reach the question raised by Benson and Whitmer's committee regarding mootness.

---

**CONCURRING IN PART AND CONCURRING IN THE JUDGMENT**

---

CHAD A. READLER, Circuit Judge, concurring in part and concurring in the judgment. With plaintiff Ronald Weiser having failed to plausibly show that he has been injured by an asymmetric restriction on his political speech, I concur in that aspect of the majority opinion. But with respect to plaintiff Michigan Republican Party's purported injury, the standing analysis is not as clear cut. To the extent the Michigan Republican Party's claims also turn on fundraising limits that are not asymmetric, there is no standing to assert those claims. But had the Michigan Republican Party approached standing from a slightly different angle, today's result may have been different. After all, as the facts of this case reveal, the recall exception equipped Governor Whitmer and the Michigan Democratic Party with one-sided fundraising advantages to the tune of $3.5 million. And those advantages are disadvantages to other political parties, particularly the Michigan Republican Party as it attempts to elect its own candidates.

The familiar rules of standing require a plaintiff to allege (1) an injury-in-fact that is (2) traceable to the defendant's conduct, and (3) redressable by the relief sought. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Our standing analysis, of course, is framed by "the specific circumstances of individual situations." *United States ex rel. Chapman v. Fed. Power Comm'n*, 345 U.S. 153, 156 (1953). The context here is a claim that several facially evenhanded provisions of Michigan campaign finance law are "oddhanded" in effect. *See Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 101 (2014) (Scalia, J., dissenting).

As to Weiser, the majority opinion is correct that Weiser's alleged injury—asymmetric contribution limits—is implausible. *See Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 543–44 (6th Cir. 2021); *see also supra*, at 10–12, 14. Like all others who are politically active in the Wolverine State, Weiser may contribute unlimited funds when supporting (or opposing) a recall effort and when supporting a political party. Similarly, no one may contribute more than $7,150 to a Michigan gubernatorial candidate. Mich. Comp. Laws § 169.252(1)(a); *Supra*, at 2 n.1. Due to this symmetrical scheme, Weiser has not plausibly alleged a "concrete *and* particularized" injury to himself. *Spokeo, Inc. v. Robins*, 578 U.S. 330,

334 (2016) (citation omitted).    And as Weiser is the only Republican voter named in the complaint, the Michigan Republican Party's invocation of associational standing fails for the same reason. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

But the standing question is much closer with respect to whether the recall exception directly injures the Michigan Republican Party.  The majority opinion notes that the Michigan Democratic Party could "collect unlimited funds at any time."  *Supra*, at 12.  From there, the majority opinion goes on to hold that Governor Whitmer and the Michigan Democratic Party gained no advantage by operation of Michigan recall law.  And, in any event, the majority opinion reasons, any competitive disadvantage the Michigan Republican Party attributes to the recall exception is simply in "the nature of recalls" and "American politics."  *Supra*, at 14 n.11.

I would not brush aside the Michigan Republican Party's concerns so easily.  Although the Supreme Court has not articulated the precise limits of the doctrine, it has warned that a campaign finance law may run afoul of the First Amendment if it "magnif[ies] the advantages of incumbency to the point where they put challengers to a significant disadvantage."  *See Randall v. Sorrell*, 548 U.S. 230, 248 (2006) (plurality opinion); *cf. Fed. Election Comm'n v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1646–48 (2022) (examining the functional operation of campaign finance regulations to determine the regulations' injurious effects on First Amendment activity).  And as things played out here, Michigan's recall exception conferred fundraising advantages on the political party (in this case, the Michigan Democratic Party) of the incumbent governor (in this case, Governor Gretchen Whitmer) that, as a practical matter, were not available to opposing political parties (in particular, the Michigan Republican Party).

Whether this imbalance amounts to a "significant disadvantage" to the Michigan Republican Party (and all other non-incumbent parties) deserves consideration.  Generally speaking, under Michigan's recall laws, the governor and her party appear to stand in far better position than her rival political party for fundraising purposes.  It is not implausible to think that a governor's recall opposition campaign enjoys the benefit of putting a face with a campaign, so to speak:  the incumbent governor.  And that benefit would seem to exacerbate the pace of donations to the governor.  Let us not forget that, at the very time she is fending off a recall effort, the governor, as the State's chief executive, is also acting on matters of state law, matters

that may well be of interest to potential donors.  A contributor might donate on that basis alone. Perhaps the governor's recall opposition campaign will also draw contributions from a donor who would not otherwise contribute to the candidate herself.  That situation could come to pass where a donor contributes to the governor's anti-recall efforts due to a personal opposition to recall campaigns in general.  Or perhaps a donor who contributed purely due to her support for the governor at the time of the recall may not, in light of later events, have contributed to the governor closer to the re-election date, when fundraising is at its peak.

A recall committee, on the other hand, has no individual representative on the ballot. And as the recall campaign is not enmeshed with an officeholder the way the recall opposition is, it seems to lack some of the appeal the governor enjoys in soliciting financial support.  Nor would the political party opposite the governor normally have a gubernatorial candidate of their own at the time of a recall.  Michigan holds its primary elections the first week of August in the last year of the incumbent governor's term, a point at which a recall effort cannot occur.  Mich. Comp. Laws § 168.951(1).  Beyond that, the governor's political adversaries have only minimal incentive to support a recall.  A successful recall effort, it bears noting, merely replaces the governor with the lieutenant governor, *id.* § 168.975g; Mich. Const. art. V, § 26, an individual who must be the governor's running mate and a member of her party, Mich. Const. art. V, § 21. Donations to a recall committee, in other words, are in effect donations to elect the lieutenant governor.

Now consider the benefits enjoyed by the governor's political party.  Win or lose, the governor can funnel any remaining recall exception funds to her favored political party.  True, a donor may, at the time of her contribution, expressly designate her recall contribution for return if the funds remain unspent when the recall cycle concludes.  R.1-1, PageID# 21.  But the donor's interest in supporting the governor suggests that designating a contribution for return is the exception, not the norm.  That was certainly the case here.  According to plaintiffs' complaint, at least 119 donors to Governor Whitmer's recall opposition campaign contributed more than the Michigan Campaign Finance Act's $7,150 limit.  And only one donor designated the contribution for return. *Supra*, at 12 n.9.

A non-incumbent political party, on the other hand, may have no relationship to the recall effort, meaning monies contributed to support the recall would be unlikely to be passed on to that party. Of course, as the majority opinion observes, in general, Weiser (or anyone else) may make unlimited contributions directly to his preferred party (in this case, the Republican party), money that ultimately could be spent to support the party's gubernatorial candidate. But there are reasons why individuals might give money to a specific candidate as opposed to a faceless recall campaign or a party committee. Some have already been noted. Another is that a contribution directly to the governor might be remembered more by the officeholder than money given to her party. Yet another is that political realities may depress enthusiasm and thus support for the recall campaign.

These competitive imbalances become even more pronounced when one considers that contributions to a recall campaign, both for and against, have no limits, unlike contributions to a gubernatorial candidate, which are capped at $7,150 during the current election cycle. Mich. Comp. Laws § 169.252(1)(a); *see also supra*, at 2 n.1. At the outset, it bears emphasis that the threshold to initiate a recall cycle is low. As the Michigan Bureau of Elections recently clarified, although "the mere act of forming and registering a recall committee" does not open the recall cycle, other acts, such as "soliciting funds, making expenditures, or actively gathering signatures," do so, as does submitting a proposed recall petition to the Michigan Board of Canvassers for approval. Letter from Adam Fracassi, Mich. Bureau of Elections, to Tori Sachs, Mich. Freedom Fund, 10-11 (Dec. 21, 2021), https://www.michigan.gov/sos/-/media/Project/Websites/sos/25delrio/MFF_v_Whitmer_File_744164_7.pdf?rev=9446770e0676 4b3bac1b3d93a0b82833&hash=73C55FB1A93AFA14478D0CE1992A877D (last visited Sept. 2, 2022); *see* Mich. Comp. Laws § 168.951a(3). That low bar, curiously, might even allow for a nefarious candidate to initiate a recall effort against herself to reap the fundraising benefits. In any event, the bottom line is that the initiation of a recall, no matter its origin, provides the governor with a functional means to sidestep the Michigan Campaign Finance Act's strict limits on individual contributions. *See* Mich. Comp. Laws § 169.252. Today's case offers vivid examples. In all, at least 119 donors to Governor Whitmer's recall opposition campaign contributed more than the $7,150 limit. Documents appended to plaintiffs' complaint reflect that

at least five donors gave $250,000 or more apiece—nearly 35 times the individual contribution limit—while five other donors contributed at least $100,000.

Yes, as the majority opinion points out, the incumbent must disgorge recall exception funds after the recall cycle concludes. *Supra*, at 3. But it is hard to see how that bridges any competitive gap when the incumbent may deposit these funds with her political party. R.1-1, PageID# 21; Mich. Comp. Laws § 169.245(2). That too was not a hypothetical exercise in this instance. Of all of the many charitable, civic, and cultural organizations that could have been the beneficiaries of Governor Whitmer's excess recall opposition funds, she donated the entire sum—more than $3.5 million in all—to the political party that nominated her for office, the Michigan Democratic Party. *Gretchen Whitmer for Governor Annual CS*, Mich. Dep't of State, https://cfrsearch.nictusa.com/documents/519803/details/filing/expenditures?schedule=%2A&changes=0 (last visited Sept. 2, 2022) (disclosing the contribution). Not one penny, it appears, went to any other organization. *See* R.1-1, PageID# 21 (authorizing disgorgement of leftover recall funds to a "tax exempt charitable institution"); *see also* Mich. Comp. Laws § 169.245(2).

I agree wholeheartedly with the majority opinion that Governor Whitmer did not "engage[] in a money-laundering operation." *Supra*, at 12 (quotation marks omitted). But the rub here is not any illegal activity—it is the competitive advantages the Governor and her party achieved through their purported *compliance* with Michigan's recall law. Again, that regulatory scheme allowed Governor Whitmer to receive $3.5 million in individual contributions that the Michigan Campaign Finance Act would otherwise not allow. And that money seemingly will be used to further her and her party's political ambitions, at the expense of the rival Michigan Republican Party. It seems safe to assume that the Michigan Democratic Party will donate at least $143,000 (the statutory cap for party contributions to gubernatorial campaigns) of the $3.5 million windfall it received from Governor Whitmer back to her reelection campaign. Mich. Comp. Laws § 169.252(4). The Michigan Democratic Party may then spend the remainder of the recall exception funds to support her re-election campaign. *See id.* Or the Party could spend some of these monies on down-ballot races, which could indirectly benefit the Governor's campaign. Any way you slice it, Secretary Benson's application of the recall exception

enhanced the Michigan Democratic Party's interest in electing its own candidates, at the expense of other political parties.

Despite these realities, the Michigan Republican Party framed its direct injury in a different vein. From the start, the Party described its claims as arising from Republican voters' inability to make campaign contributions on level ground with their Democratic counterparts. Yet as discussed, that form of challenge has proven difficult to sustain. The Party, I suspect, could have levied a plausible alternative theory that the recall exception has a pro-incumbent bent that leads to a competitive disadvantage for challengers and their parties. But plaintiffs' complaint alleged no facts to support a competitive injury theory save for a passing reference in one paragraph of the complaint. Nor, other than a single sentence chaperoned by a string cite footnote, did plaintiffs press this theory on appeal. Pleading the case another way may well have strengthened plaintiffs' hand. *Cf. Glennborough Homeowners Ass'n v. U.S. Postal Serv.*, 21 F.4th 410, 414 (6th Cir. 2021) (noting that plaintiffs may forfeit arguments for standing). But as the case was presented to us, I agree that the Michigan Republican Party's claims fail to satisfy Article III's standing requirements.